UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ADAM GUTIN, MITCHELL GUTIN, and MARGO GUTIN, | : | |
| | : | HONORABLE JOSEPH E. IRENAS |
| Plaintiffs, | : | CIVIL ACTION NO. 04-1947 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| WASHINGTON TOWNSHIP BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |

**APPEARANCES:**

LAW OFFICE OF CHRISTOPHER MANGANELLO
By:  Christopher M. Manganello, Esq.
18 Pitman Avenue, Suite 104
Pitman, New Jersey 08071
          Counsel for Plaintiffs

CAPEHART & SCATCHARD, P.A.
By:  Micahel E. Heston, Esq.
Laurel Corporate Center, Suite 300
Mount Laurel, New Jersey 08054
          Counsel for Defendant


**IRENAS**, Senior District Judge:

     Plaintiffs, Adam Gutin, and his parents, Mitchell and Margo

Gutin, bring this § 1983 suit against the Washington Township

Board of Education (the "Board of Education" or "School Board")

asserting violations of Adam's constitutional, federal, and state

statutory rights arising out of Adam's positive drug tests and

subsequent expulsion from Washington Township High School.

Presently before the Court is the Board of Education's Motion for

Summary Judgment.[1]

# I.

During the 1999-2000 academic year, Plaintiff Adam Gutin was a 15 year-old ninth-grade student at Washington Township High School.  Because Adam had been diagnosed with Attention Deficit Disorder ("ADD"), an "Accommodation Plan" pursuant to Section 504 of the Rehabilitation Act was created for Adam on November 1, 1999.  The plan's "intervention strategy" included seating Adam near "the source of classroom action" and away from distractions; creating weekly progress reports detailing Adam's behavior, missed assignments, and grades; and providing Adam individual after-school help.

About two weeks after the Accommodation Plan's creation, Adam's parents requested that a Child Study Team ("CST") evaluate Adam to determine whether he had a specific learning disability[2]

---

[1]  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

[2]  "'Specific learning disability' corresponds to 'perceptually impaired' and means a disorder in one or more of the basic psychological processes involved in understanding or using language, spoken or written, that may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.  (i.) A specific learning disability can be determined when a severe discrepancy is found between the student's current achievement and intellectual ability in one or more of the following areas: (1) Basic reading skills; (2) Reading comprehension; (3) Oral expression; (4) Listening comprehension; (5) Mathematical calculation; (6) Mathematical problem solving; (7) Written expression; and (8) Reading fluency." N.J.A.C. § 6A:14-3.5(c)(12).

that would make him eligible for special education services under the Individuals with Disabilities Education Act ("IDEA").[3]  The CST met with Adam's parents twice and considered Adam's past and current academic achievement levels; standardized test scores (including IQ scores); previous psychological, learning, and psychiatric evaluations; and his medical diagnosis of ADD.  The CST also "consulted with" Mr. John Tortoriello, who was Adam's "504 Case Manager / Guidance Counselor."  (Defs' Ex. 1, B & C)[4]

On December 8, 1999, the CST informed Adam's mother by letter that, after reviewing all of the information, "it is unlikely that Adam would meet the eligibility requirements for

---

[3]  "[T]he IDEA requires states to guarantee certain procedural rights in order to qualify for funding. Many of these procedural mechanisms have been implemented in the laws and regulations of New Jersey. . . . First, a state must demonstrate that it has a system in place to identify, locate, and evaluate all children with disabilities residing in the state. *See* 20 U.S.C. § 1412(a)(3); *see also [W.B. v.] Matula*, 67 F.3d at 492; N.J.A.C. § 6A:14-3.1(a). This obligation is commonly referred to as the 'child find' duty. *Matula*, 67 F.3d at 492. In New Jersey, if a parent requests an evaluation for his or her child, the request shall immediately be considered a referral to a Child Study Team ("CST") to determine if the child should be classified as disabled. See N.J.A.C. § 6A:14-3.3(d)(2).  Second, after identifying and evaluating children with disabilities, a state must develop and implement Individual Education Programs ("IEP") for all children classified as disabled. *See* 20 U.S.C. §§ 1412(a)(4), 1414(d); *see also* 34 C.F.R. § 300.128(a); N.J.A.C. § 6A:14-3.1(a); *Matula*, 67 F.3d at 492." *M.A. ex rel. E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335, 338-39 (3d Cir. 2003).

[4]  The IDEA requires that the "State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation" of a student "to determine whether a child is a child with a disability (as defined in section 602 [20 USCS § 1401])" and "the educational needs of such child."  20 U.S.C. § 1414(a)(1)(A), (C)(i); *see also* N.J.S.A. § 18A:46-5 ("Each county child study team shall function in consultation with the local boards of education in the county or the local boards of education in the counties served by it in the fields pertaining to: a. identification and diagnosis of children needing special educational services").

classification under present State guidelines.[5]  Based upon that,
the Child Study Team, together with yourself, agreed that Adam
does not require a full Child Study Team evaluation at this
time." (Defs' Ex. 1, B)  The letter informed Adam's mother how
to appeal the decision but no appeal was taken.  Thus, no IEP was
ever created for Adam.

Then, on December 21, 1999, one of Adam's teachers, Ms.
Pasquarel, observed him behaving unusually.  In particular, she
observed that Adam was sleeping in class, had glassy eyes, and
complained of nausea, leading her to conclude that Adam was under
the influence of drugs.

The State of New Jersey and local school boards throughout
the State have adopted extensive and detailed procedures which
govern the steps to be taken when a student is suspected of being
intoxicated.  New Jersey law mandates that:

> Whenever it shall appear to any teaching staff
> member, school nurse or other educational personnel
> of any public school in this State that a pupil may
> be under the influence of substances as defined
> pursuant to section 2 of this act,[6] other than
> anabolic steroids, that teaching staff member,
> school nurse or other educational personnel shall
> report the matter as soon as possible to the school
> nurse or medical inspector, as the case may be, or
> to a substance awareness coordinator, and to the

---

[5]  *See supra* fn. 2.

[6]  "'Substance' shall mean alcoholic beverages, controlled dangerous
substances . . . anabolic steroids or any chemical or chemical compound which
releases vapors or fumes causing a condition of intoxication, inebriation,
excitement, stupefaction or dulling of the brain or nervous system . . ."
N.J.S.A. § 18A:40A-9.

principal or, in his absence, to his designee. The
principal or his designee, shall immediately notify
the parent or guardian and the superintendent of
schools, if there be one, or the administrative
principal and shall arrange for an immediate
examination of the pupil by a doctor selected by the
parent or guardian, or if that doctor is not
immediately available, by the medical inspector, if
he is available. If a doctor or medical inspector is
not immediately available, the pupil shall be taken
to the emergency room of the nearest hospital for
examination accompanied by a member of the school
staff designated by the principal and a parent or
guardian of the pupil if available. The pupil shall
be examined as soon as possible for the purpose of
diagnosing whether or not the pupil is under such
influence. A written report of that examination
shall be furnished within 24 hours by the examining
physician to the parent or guardian of the pupil and
to the superintendent of schools or administrative
principal. If it is determined that the pupil was
under the influence of a substance, the pupil shall
be returned to his or her home as soon as possible
and shall not resume attendance at school until the
pupil submits to the principal a written report
certifying that he or she is physically and mentally
able to return thereto, which report shall be
prepared by a personal physician, the medical
inspector or the physician who examined the pupil
pursuant to the provisions of this act.

N.J.S.A. § 18A:40A-12.

State administrative regulations further provide:

(a) In instances involving alcoholic beverages,
controlled dangerous substances other than anabolic
steroids, or any other chemical or chemical compound
as identified in N.J.S.A. 18A:40A-9 and N.J.A.C.
6A:16-4.1(a), the following shall apply:

1. Any educational staff member or other
professional to whom it appears that a student may
be currently under the influence of alcohol or other
drugs on school property or at a school function
shall report the matter as soon as possible to the
principal and the certified or noncertified school
nurse or the school physician, according to the

requirements of N.J.S.A. 18A:40A-12.

i. In the absence of the principal, his or her designee shall be notified.

ii. In instances where the principal and the certified or noncertified school nurse or the school physician are not in attendance, the staff member responsible for the school function shall be immediately notified.

iii. The referring staff member shall complete the Violence, Vandalism and Substance Abuse Incident Report, according to the requirements of N.J.S.A. 18A:17-46 and N.J.A.C. 6A:16-5.3.

2. In response to every report by an educational staff member or other professional of suspected student alcohol or other drug use, the principal or his or her designee shall:

i. Immediately notify the parent and the chief school administrator; and

ii. Arrange for an immediate medical examination of the student for the purposes of providing appropriate health care for the student and for determining whether the student is under the influence of alcohol or other drugs, other than anabolic steroids.

3. The medical examination shall be performed by a physician licensed to practice medicine or osteopathy that is selected by the parent.

i. The district, in cooperation with medical professionals licensed to practice medicine or osteopathy, may establish the minimum requirements for the medical examination.

ii. When the medical examination is conducted by a physician selected by the parent, the examination shall be at the expense of the parent and shall not be at the expense of the district board of education.

4. If the physician chosen by the parent is not immediately available, the medical examination shall be conducted by the school physician.

i. If the school physician is not available, the student shall be accompanied by a member of the

school staff, designated by the principal, to the
emergency room of the nearest hospital for
examination.
    ii. The student's parent, if available, shall
also accompany the student.
    iii. When the medical examination is conducted by
the school physician or a physician at the emergency
room of the nearest hospital, such examination shall
be at the expense of the district board of
education.

. . .

    10. If there is a positive determination from the
medical examination, indicating that the student's
alcohol or other drug use interferes with his or her
physical or mental ability to perform in school:

    i. The student shall be returned to the care of a
parent as soon as possible.
    ii. Attendance at school shall not resume until a
written report has been submitted to the parent, the
principal and chief school administrator from a
physician licensed to practice medicine or
osteopathy who has examined the student to determine
whether alcohol or other drug use interferes with
his or her physical or mental ability to perform in
school.
    iii. The report shall verify that the student's
alcohol or other drug use no longer interferes with
his or her physical and mental ability to perform in
school; and
    iv. Removal of a student with a disability shall
be made in accordance with N.J.A.C. 6A:14-2.8.


N.J.A.C. § 6A:16-4.3(a).

    The Board of Education has also adopted a Substance Abuse

Policy which sets out the steps to be taken when a student is

believed to be under the influence of alcohol or other drugs.[7]

---

    [7]  By statute, "[e]ach local board of education [in New Jersey] shall
. . . establish a comprehensive substance abuse intervention, prevention and
treatment referral program in the public elementary and secondary schools of
the district. . . . Each school district shall develop a clear written policy

The Board's "Substance Abuse Policy Violation Checklist," employed by Adam's school in this case, lists the protocol:

> Report the incident
>
> Remove the student to a protective environment
>
> School nurse assess that the student is or is not in need of emergency medical care
>
> Assess the physical state of the student
>
> Notify parent / guardian, principal, superintendent
>
> Inform parent/guardian of options for urine analysis
>
> Arrange for urine analysis
>
> Arrange for appropriate care of student while awaiting the results of medical examination
>
> [If] Positive Diagnosis:
>
> Meet with parent/guardian
>
> Carry out due process procedure
>
> Inform parent/guardian of disciplinary action
>
> Inform parent/guardian of mandatory drug/alcohol evaluation/counseling component
>
> Student Assistance Counselor to provide list of contracted services providers for evaluation

(Heston Cert. Ex. 1, C)  The urine test must be performed within two hours of notifying the student's parent or guardian.  (Id. at Ex. 1, E)  If the student refuses to take a urine test, the Board's policy is to treat the student as if he has tested positive for a prohibited substance.  (Id. at Ex. 3)

---

statement which outlines the district's program to combat substance abuse and which provides for the identification, evaluation, referral for treatment and discipline of pupils who are substance abusers."  N.J.S.A. § 18A:40A-10.

Thus, in accordance with state law and the Board of Education's Substance Abuse policy, Ms. Pasquarel reported to Assistant Principal, Jeffrey Specter, her belief that Adam was under the influence of drugs.  Soon thereafter, Mr. Specter telephoned Adam's mother, Plaintiff Margo Gutin, to advise her that her son was present in Mr. Specter's office because he was suspected of being under the influence of drugs.

The parties dispute whether Mrs. Gutin gave permission to test Adam for drugs, but the parties do not dispute that Adam was taken by school bus to Kennedy Memorial Hospitals-University Medical Center's ("Kennedy Hospital") emergency room[8] where a urine screen yielded a positive result for marijuana.  Adam was placed on out-of-school suspension for five days and then placed on in-school suspension for another five days.

Upon Adam's return to school for his first day of in-school suspension on January 6, 2000, Mr. Spector held a "return conference" with Adam, his mother, and Student Assistant Coordinator, Marjorie Chassels.  The group discussed Adam's treatment plan, which included intensive drug therapy three days a week.  Adam was also required to submit to random drug tests twice during his treatment.  The Board of Education's policy required Adam to agree to participate in treatment and submit to

---

[8]  When a parent does not chose another doctor, the Board of Education's policy is to send students to Kennedy Hospital's emergency room.  (Heston Ex. 1, E)

9

random drug testing as a condition of returning to school. (Heston Ex. 1, C)  Either failing to attend treatment or a second positive drug test are grounds for expulsion.  (Id.)

Adam's first random drug test on February 22, 2000, yielded another positive result for marijuana.[9]  As a result, the Executive Assistant Principal of the high school recommended to the Board of Education that Adam be expelled from school.

Prior to Adam's expulsion hearing before the Board of Education, a separate "Manifestation Determination Hearing" was held on March 3, 2000, to address whether Adam's smoking marijuana was a "manifestation of the disability."[10]  (Defs' Ex. 1, C)  Adam and his father participated at the hearing, discussing the issue with a panel made up of two of Adam's teachers, a representative from the Child Study Team, a speech pathologist, Mr. Spector, and Mr. Tortoriello.  The panel voted 4 to 3 that Adam's behavior was not a manifestation of his disability.  Plaintiffs did not appeal the manifestation decision.

The expulsion hearing before the Board of Education was held on April 17, 2000.  Adam and his parents retained counsel prior to the hearing.  The Board decided to expel Adam, effective on

_____

[9]  Like the first drug test, the random test was performed on a urine sample.

[10]  Though not explicit, it appears that "the disability" to which the hearing notes refer is ADD, as no other disability has been identified in the record.

10

his 16th birthday.[11]   The Gutins pursued an administrative appeal
of the expulsion decision in accordance with the procedures
established in N.J.A.C. §§ 6A:3-1.1 - 1.17.   Over the long
procedural course of the appeal,[12] they asserted that: (1) the
Board of Education's decision to expel Adam violated his rights
under the Individuals with Disabilities Education Act ("IDEA"),
20 U.S.C. §§ 1400-1491; (2) the Board failed to comply with
N.J.S.A. § 18A:40A-10, which requires the Board to provide
parents with a copy of the Board's drug policy; (3) the drug test
administered to Adam on December 21, 1999, violated Adam's Fourth
Amendment rights; and (4) the Board violated Adam's Due Process
rights during the expulsion hearing by not allowing his attorney
to (a) call Ms. Pasquarel as a witness and (b) impeach Mr.
Spector with a surreptitious tape recording of a conversation Mr.

------

[11]   Adam was to receive homebound instruction for the several months
before his 16th birthday.   The parties dispute whether Adam received adequate
homebound instruction.

[12]   The Gutins first applied for emergent relief in the summer of 2000,
seeking Adam's readmission to school, which was denied on the ground that the
Gutins had failed to establish irreparable harm because school was not
currently in session and Adam could make-up any missed instruction should the
appeal extend into the school year.   In September, 2000, a three day plenary
hearing was held where Acting Chief Administrative Law Judge Masin dismissed
all of the Gutins' claims.   The Gutins filed exceptions to ALJ Masin's
decision with the Commissioner of Education, who remanded the case to the
Board on the ground that the Board had not considered alternatives to
expulsion before expelling Adam.   In accordance with the Commissioner's
directive, the Board considered alternatives to expulsion and again concluded
that expulsion was appropriate.   The Gutins appealed.   This time, ALJ Bruce
Campbell denied their application for emergent relief, and after a plenary
hearing, determined that the Board had complied with the Commissioner's order
of remand and did not act arbitrarily or capriciously.   The Commissioner
affirmed ALJ Campbell's decision.   The Gutins filed an appeal of the
Commissioner's decision with the New Jersey State Board of Education but the
appeal was dismissed for failure to prosecute.

Specter had with Adam's uncle.[13]

In the present suit, the Gutins seek compensatory and punitive damages, asserting some, but not all, of the claims they asserted during the administrative appeal process.[14]  The Board of Education presently moves for summary judgment asserting that it is entitled to judgment as a matter of law based on the doctrine of collateral estoppel and alternatively, that the undisputed evidence establishes that the Board of Education did not violate any of Adam's federal constitutional or statutory rights.

For the reasons explained below, the Board's motion for summary judgment will be granted in part and denied in part.


**II.**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v.*

---

[13]  Sometime after Adam's second positive drug test, Adam's uncle met with Mr. Spector to discuss the situation.  Adam's uncle secretly taped the conversation, during which Mr. Specter suggested that Adam could avoid the expulsion hearing by falsely claiming his grandparents' address as his own residence thereby enabling him to enroll in Deptford High School.

[14]  Mitchell and Margo Gutin also assert a loss of consortium claim.

*Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.
56(c)).  In deciding a motion for summary judgment, the Court
must construe the facts and inferences in a light most favorable
to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*,
794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not
"to weigh the evidence and determine the truth of the matter, but
to determine whether there is a genuine issue for trial."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

   "'With respect to an issue on which the non-moving party
bears the burden of proof, the burden on the moving party may be
discharged by 'showing'– that is, pointing out to the district
court – that there is an absence of evidence to support the
nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. &
Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).
"The plain language of Rule 56(c) mandates the entry of summary
judgment . . . against a party who fails to make a showing
sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden
of proof at trial.  In such a situation, there can be 'no genuine
issue as to any material fact,' since a complete failure of proof
concerning an essential element of the nonmoving party's case
necessarily renders all other facts immaterial."  *Celotex*, 477
U.S. at 322; Fed. R. Civ. P. 56(e) (A party opposing summary
judgment cannot rest upon the "mere allegations or denials of the

adverse party's pleading" but must respond with affidavits or
depositions setting forth "specific facts showing that there is a
genuine issue for trial.").

## III.

### A.

Defendant asserts that collateral estoppel applies,
reasoning that all of the issues raised by the present lawsuit
were raised and decided in the previous administrative appeal of
the Board's decision.  Defendant therefore concludes that summary
judgment is proper on this basis alone.  Defendant's argument,
however, goes too far.

When the previous adjudication takes place in a state
administrative setting, later *claims* in federal court are not
barred.  *See New Jersey-Philadelphia Presbytery of Bible
Presbyterian Church v. New Jersey State Bd. of Higher Education*,
654 F.2d 868, 877 (3d Cir. 1981) ("the Supreme Court has held
that neither 28 U.S.C. § 1738 nor federal common law principles
of res judicata require deference to administrative as distinct
from judicial proceedings.") (citing *Prentis v. Atlantic Coast
Line Co.*, 211 U.S. 210, 226-28 (1908)).  Rather, the parties are
only precluded from relitigating *facts* that were found by the
administrative agency.  *Edmunson v. Borough of Kennett Square,* 4
F.3d 186, 191 (3d Cir. 1993).  Stated another way, the parties

14

may not dispute facts found by the administrative agency but may contest legal conclusions based on those facts.  *Id.*[15]

Accordingly, the Court turns to the merits of this case, accepting the facts found in the administrative proceedings as true but conducting its own legal analysis.

B.

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C.

_____

[15]  Indeed, with respect to the IDEA claims, accepting Defendant's argument would directly undercut the judicial review provisions of the statute.  *See* 20 U.S.C. §§ 1415(e)(2); 1439(a)(1).  The Third Circuit has explained, "[a]s to findings of fact, the proper standard of review for the District Court [in IDEA cases] . . . is 'modified de novo.'  Under this approach, reviewing courts are required to defer to the . . . hearing officer's factual findings unless . . . they can point to contrary nontestimonial extrinsic evidence on the record, or unless the record read in its entirety would compel a contrary conclusion. . . . If the reviewing court does not receive additional evidence, it must find support for any factual conclusions contrary to the hearing officer's and must explain why it does not accept the . . . findings of fact to avoid the impression that it is substituting its own notions of sound . . . policy for those of the agency it reviews." *Bucks County Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 65-66 (3d Cir. 2004)(internal citations and quotations omitted); *see also Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995) ("a district court's scope of review under section 1415(e)(2) . . . goes beyond the traditional deferential standard [applied when reviewing state administrative decisions].")  The parties in this case do not dispute the facts found during the administrative process, therefore the Court accepts those facts as true.

§ 1983.

"A municipality can be sued directly under § 1983 if it is alleged to have caused a constitutional tort through a policy, ordinance, regulation or officially adopted decision that has been promulgated by the municipality's officers." *Brennan v. Norton*, 350 F.3d 399, 427 (3d Cir. 2003); *see also Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006). "[M]unicipal liability may [also] exist where authorized policymakers approve a subordinate's decision and the basis for it." *Brennan,* 350 F.3d at 427 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988)). Another "possible source of liability against [a municipality] under § 1983 is if 'an unconstitutional policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.'" *Id.* (quoting *Praprotnik*, 485 U.S. at 123).

Fundamentally, "in order for municipal liability to exist, there must [] be a violation of the plaintiff's constitutional rights." *Sanford*, 456 F.3d at 314. For the reasons explained below, the Court concludes that Adam's right to be free from unreasonable searches and his right to due process, guaranteed by the Fourth and Fourteenth Amendments, were not violated.

16

(1)

Plaintiffs assert that the school district's drug testing policy violated Adam's rights because the policy has no provision *requiring* consent of a student's parent before testing.[16]  The School District's policy states: "Whenever it shall appear to any teaching staff member, school nurse or other educational personnel of any public school in this State that a pupil may be under the influence of substances . . . that teaching staff member, school nurse or other educational personnel shall report the matter as soon as possible."  N.J.S.A. § 18A:40A-12; *see also* N.J.A.C. § 6A:16-4.3(a)(1) ("Any educational staff member or other professional to whom it appears that a student may be currently under the influence of alcohol or other drugs on school property or at a school function shall report the matter as soon as possible.").

It is important to note at the outset that the policy at issue is not one of suspicionless or random testing.  Rather, the School District's policy provides for testing only upon an individualized suspicion that a particular student is under the influence of drugs in school.  *Contrast Bd. of Ed. v. Earls*, 536 U.S. 822 (2002); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646

---

[16]  The policy clearly provides for testing when a parent consents, as it allows for the parent to select the physician to conduct the medical examination.  Plaintiffs' asserted deficiency in the policy is that parental consent is not a mandatory prerequisite to all drug testing pursuant to the policy.

(1995)(school district policies authorizing random urinalysis drug testing of students).  Therefore, the issue presented is whether the Fourth Amendment requires parental consent in every case before testing a student who is reasonably suspected of being under the influence of drugs while in school.[17]  The Court concludes that parental consent is not required by the Fourth Amendment.

The "reasonableness" of a governmental search is the "touchstone" of its constitutionality.  *Earls*, 536 U.S. at 828-29.  In light of several Supreme Court decisions, it is beyond dispute that in the context of school officials' searches of high school students, a reasonable search "does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law."  *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 348 (1985).[18]  Rather, the reasonableness of such a search depends on (1) the nature and scope of the privacy interest upon which the search intrudes; (2) the character of the intrusion complained of; and (3) the nature and immediacy of the

---

[17]  Plaintiffs apparently do not dispute that Adam's teacher and the Assistant Principal had reasonable suspicion to believe that Adam was under the influence.  In any event, given the undisputed record which demonstrates that Adam was observed behaving unusually, that he complained of nausea, had glassy eyes, and was sleeping in class, the Court holds that reasonable suspicion existed.  *See Hedges v. Musco*, 204 F.3d 109,117 (3d Cir. 2000) (teacher had reasonable suspicion to believe that student was under the influence where her face was flushed, her eyes were glassy and red, her pupils were dilated, and she behaved in an uncharacteristic manner).

[18]  *See also Earls,* 536 U.S. at 828-29; *Acton,* 515 U.S. at 653-54.

governmental concern at issue and the efficacy of the means for meeting it.  *Earls*, 536 U.S. at 830, 832, 834; *Acton,* 515 U.S. at 654, 658, 660.

The Court fails to see how lack of consent renders drug testing based on reasonable individualized suspicion unconstitutional.[19]  In *T.L.O.,* the search of a student's purse upon suspicion that she was violating her school's smoking prohibition was held constitutional even though the student did not consent to the search.  After a teacher took T.L.O. to the Assistant Vice Principal, the Vice Principal "asked T.L.O. to come into his private office and demanded to see her purse.  Opening the purse he found a pack of cigarettes."  *T.L.O.,* 469 U.S. at 328.  Similarly here, Adam was taken to the Assistant Principal's office based on the suspicion that he was under the influence, whereupon Adam's mother was notified and arrangements were made to have Adam screened for drug use at Kennedy Hospital.

Moreover, the Third Circuit's analysis in *Hedges v. Musco*, 204 F.3d 109 (3d Cir. 2000), supports the conclusion that lack of consent is not fatal to a reasonableness finding.  In *Hedges*, parents of a New Jersey public high school student challenged the drug testing of their daughter pursuant to the school district's

---

[19]  Notably, in both *Acton* and *Earls,* cases where individualized suspicion was lacking, students were required to consent to drug testing as a pre-condition of their participation in extracurricular activities.  However, as previously noted, this case does not present the issue of suspicionless testing.

drug testing policy.[20]  The student was observed by her teacher as having glassy, red eyes with dilated pupils and acting uncharacteristically.  *Hedges*, 204 F.3d at 112-13.  Based on these observations, the student was sent to the school nurse upon suspicion of being "high."  *Id.*  After being examined by the nurse, the student was eventually taken to a hospital where a blood test and urinalysis were conducted.  *Id.* at 113.[21]

The student's parents brought a § 1983 suit alleging that the drug test violated the Fourth Amendment.  After examining the three factors set-out above, the Court concluded that the student's Fourth Amendment rights were not violated.  *Hedges,* 204 F.3d at 120-21.  After reaching that conclusion, the Court further stated, "[b]ecause we conclude that the search was reasonable, we need not reach the [defendants'] argument that plaintiffs consented to the search."  *Id.* at n.13.  Thus, *Hedges* indicates that lack of consent is an independent and non-dispositive issue from the reasonableness of a search based on reasonable suspicion.

Similarly, in *Kerns v. Chalfont-New Britain Township Joint Sewage Authority*, a sewage plant employee challenged his employer's urinalysis drug testing policy as unconstitutional.

---

[20]  The policy was promulgated pursuant to the same New Jersey statute and regulations that are involved in this case.  *See Hedges,* 204 F.3d at 115 and n.5 (quoting N.J.S.A. § 18A:40A-12; N.J.A.C. § 6:29-6.3).

[21]  The test results were negative for drugs and alcohol.  *Hedges*, 402 F.3d at 114.

263 F.3d 61 (3d Cir. 2001).  The Court explained, "a search
conducted with free and voluntary consent of a person searched is
constitutional."  *Id.* at 65.  Because the district court found
that Kerns had consented to the search, the Court stated, "we
begin our analysis with this ground because if there was valid
basis for [concluding the Plaintiff validly consented], we need
not evaluate the constitutionality of the Authority's drug
testing policy."  *Id.*  Thus, *Kerns* also demonstrates that consent
is a separate and independent basis for supporting the
constitutionality of a search, rather than a necessary
requirement of a search based on reasonable suspicion (or as in
*Kerns,* no suspicion).

    This conclusion is further supported by general Fourth
Amendment jurisprudence.  In criminal cases, a search is
reasonable if conducted pursuant to a valid warrant and with
probable cause.  Consent is not a necessary element of a
reasonable search.[22]  A search "conducted pursuant to consent" is
merely "one of the specifically established exceptions to the
requirements of both a warrant and probable cause."  *Schneckloth
v. Bustamonte*, 412 U.S. 218, 219 (1973).  The presence of consent
is one way of establishing a reasonable search but its absence
does not automatically render a search unreasonable.  Indeed,

---

[22]  Indeed, it is safe to say that police searches pursuant to a
warrant, and based on probable cause, frequently lack the consent of the
person searched.

this is the basic reasoning underlying *Hedges* and *Kerns.*

Accordingly, the Court holds that the School District's drug testing policy does not violate the Fourth Amendment.  Defendant is therefore entitled to summary judgment on Count I of the Complaint.


(2)

Plaintiffs further complain that their Due Process rights under the Fourteenth Amendment were violated because the School Board allegedly refused to permit Plaintiffs' expert witness to testify at his second expulsion hearing.  With regard to this claim, there is no evidence in the record that the School District has any policy or practice regarding the testimony of experts at expulsion hearings.  Therefore, the School District may only be liable if it ratified the actions of a subordinate or an inference of a School District policy can be drawn from the actions of a person with policymaking authority.  *Brennan,* 350 F.3d at 427.

After the School Board decided at the first expulsion hearing that Adam should be expelled, Plaintiffs appealed that decision to the Commissioner of Education.  The Commissioner remanded the case to the School Board with instructions to consider less severe punishments that could allow for alternative educational placements.  The Commissioner's decision was based on

22

its findings that the Drug Policy did not require expulsion and that the School Board failed to consider other alternatives to expulsion.

In accordance with the Commissioner's directive, the School Board held another expulsion hearing on December 6, 2000, to consider alternatives to expulsion.  Plaintiffs were represented by counsel at that hearing.  The hearing was conducted by the solicitor for the School Board, Mr. Joseph Betley, Esq.

Plaintiffs called Sally Anne Bickford, Ph.D., to testify on their behalf.  Dr. Bickford has expertise in ADHD (Attention Deficit Hyperactivity Disorder) evaluations of students.  As fully recorded by the hearing transcript, Dr. Bickford attempted to testify about how ADHD "explains what [Adam] did" because of ADHD's "impact" on "decision making" and "impulsivity."  (Pls. Ex. A., Hearing Transcript at p. 42)  Mr. Betley would not allow Dr. Bickford to testify on that issue, explaining,

> If . . . the purpose of this witness' testimony [is] to consider the issue of whether or not a child's condition of ADHD somehow was a contributing factor or a reason or somehow excused or is a justification for the underlying violation of the policy, I believe that is irrelevant to these proceedings.  If this witness is going to talk about or give information to the board as to whether or not expulsion is an appropriate remedy . . . than this witness' testimony is relevant, but if this witness is going to go to the issue of ADHD in terms of explaining the drug usage, then I'm going to tell you, and I will advise the Board that that evidence would not be relevant to their proceedings. . . . if this witness is going to stick to the issue of remedy or the response, that's fine.

(Pls. Ex. A at 43-44)   After Mr. Betley made the evidentiary ruling, Dr. Bickford was allowed to continue testifying.  She testified,

> I believe that the expulsion is an inappropriate action because it would be disciplining on the basis of his handicap, whether it is identified as present or not.  I believe the school district child study team made an inappropriate decision when they determined that he was not eligible for service because they included and considered only one of the 13 viable options for classification.

(Pls. Ex. A at 46-47)

At this point, Mr. Betley said, "[I] instruct the board to disregard that testimony.  That's not relevant to the proceedings . . . Counsel you are not going to use this proceeding to revisit the issue of the manifestation determinations or issues of eligibility and so forth.  If you continue to do that again we will end the proceedings."  (Pls. Ex. A at 47) Counsel for Plaintiffs responded, "Well then let's end them because that's going to be the testimony."  (Pls. Ex. A at 47)  The hearing was then concluded.

For purposes of this motion only, the Court will assume that the actions of Mr. Betley, as counsel for the School Board, can be attributable to the School Board on a ratification theory.[23]

_____

[23]   Mr. Betley is an attorney with a private law firm, not a School Board member.  In a letter to Plaintiffs' counsel prior to the expulsion hearing Mr. Betley explained, "It will be my role as Solicitor to make recommendations to the Board as to relevancy issues and other evidential matters, although I will not be voting on the substantive issues of Adam's

However Plaintiffs' claim nevertheless fails because no constitutional deprivation occurred at the hearing.

Mr. Betley's evidentiary ruling regarding the relevance of Dr. Bickford's testimony does not rise to the level of a deprivation of Due Process.  Plaintiffs were afforded a hearing on the record, represented by counsel, allowed to cross-examine the Board's witnesses, and allowed to put on testimony of their own witnesses.  *Cf. Goss v. Lopez*, 419 U.S. 565, 583 (1975) ("The [Due Proces] Clause requires at least rudimentary precautions against unfair or mistaken findings and arbitrary exclusion from school.").  Notably, Mr. Betley's ruling did not completely preclude Dr. Bickford from testifying.  Rather, the record clearly indicates that Dr. Bickford was only limited to testifying about issues Mr. Betley-- a lawyer (albeit a lawyer for the School Board)-- determined were relevant.[24]  Such a decision, even if allegedly erroneous, cannot provide the basis of a claim for violation of Plaintiffs' Due Process rights.  *See Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("§ 1983 does not extend the right to relitigate in federal court evidentiary

_____

guilt or innocence or any appropriate penalty." (Defs. Ex. 1,G)  Thus, there is no evidence from which a jury might conclude that Mr. Betley was a policymaker, leaving ratification as the only remaining theory of liability.

[24]  To the extent that Plaintiffs' Due Process argument attacks the substantive decision not to revisit the manifestation determination, as explained below, Plaintiffs had an opportunity to appeal that decision and they did not.

questions arising in school disciplinary proceedings.").[25]  To hold otherwise would directly undermine the Supreme Court's "admonition" that "'[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities.'" *Goss*, 419 U.S. at 578 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).

Accordingly, the School Board is entitled to judgment as a matter of law on the Due Process claim (Count III of the Complaint).

(3)

Counts II and IV of the Complaint apparently assert violations of IDEA and Section 504 of the Rehabilitation Act (although neither statute is cited in the Complaint).  The Complaint asserts that Adam had a right to a "free and appropriate public education" ("FAPE")[26] and that the School Board violated that right both by expelling him and through the inadequate provision of homebound instruction until his 16th

---

[25] *See also Wagner v. Ft. Wayne Community Schools*, 255 F. Supp. 2d 915, 927 (N.D. Ind. 2003) (holding student's Due Process rights during expulsion hearing were not violated by hearing officer's exclusion of evidence determined to be irrelevant).

[26] "Free and appropriate public education" is used in both the IDEA and the regulations implementing § 504. *See Matula*, 67 F.3d at 493 (citing 34 C.F.R. § 104.33(a)).

birthday.  However, Plaintiffs' letter brief in opposition to the present motion fails to elaborate on a theory of liability. Thus, the Court is left to infer from the administrative record how the harm complained of resulted from a violation of the IDEA or Section 504.[27]

With respect to disciplinary alternative educational placements, the IDEA provides, "If the result of the [IEP Team] review . . . is a determination that the behavior of the child with a disability[28] was not a manifestation of the child's disability, the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner in which they would be applied to children without disabilities, except as provided in section 1412(a)(1) of this title."  20 U.S.C. § 1415(k)(5)(A).  Section 1412(a)(1), in turn, states, "A free and appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities

---

[27]   For purposes of this motion, there appears to be no difference between claims based on the IDEA and claims based on Section 504.  *See generally, Matula*, 67 F.3d at 493 ("There appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition."); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 253 (3d Cir. 1999) ("the failure to provide a free appropriate public education violates IDEA and therefore could violate § 504.")(citing *Matula*).

[28]   It is worth noting that the CST never determined whether Adam had an IDEA eligible disability.  However, Adam was determined to have a disability under Section 504 and a manifestation determination hearing was held wherein the committee proceeded on the assumption that Adam's ADD was a disability. Therefore the Court will assume for the purposes of this motion only that Adam had an eligible disability under IDEA.  Of course, if a fact finder later determines that Adam did not have an IDEA eligible disability, the IDEA claim will fail.

who have been suspended or expelled from school." *See also* N.J.A.C. § 6A:14-2.8(f).

Here, Plaintiffs did not appeal Adam's manifestation determination, although the IDEA and New Jersey's implementing regulations establish a mechanism for doing so. *See* 20 U.S.C. §1415(k)(6)(A); N.J.A.C. § 6A:14-2.7.[29]   Therefore, to the extent that Plaintiffs now ask this Court to revisit the determination, their claims are barred for failure to exhaust their administrative remedies.

The Court concludes that this result is consistent with *Matula*.   In *Matula*, the Third Circuit held that exhaustion of administrative remedies is only a prerequisite to filing civil actions seeking "'relief that is also available under [IDEA].'" 67 F.3d at 495 (quoting 20 U.S.C. § 1415(f)).   Alternatively, "where the relief sought in a civil action is not available in an IDEA administrative proceeding, recourse to such proceedings would be futile and the exhaustion requirement is excused." *Id.* at 496.   Therefore, one might reason that since money damages (compensatory and punitive) are not available in administrative proceedings, all suits for money damages are excused from the exhaustion requirement.   As two other district courts have aptly explained, however, *Matula's* holding is not so broad.

---

[29]   Indeed, Plaintiffs at least partially invoked the administrative review process with respect to other issues.   However they never formally challenged the manifestation determination or the CST's prior decision to not pursue whether Adam had an IDEA eligible disability.

> Two additional considerations were central to the
> court's holding.  First, the parties in *W.B. [v.
> Matula,* 67 F.3d 484 (3d Cir. 1995)] had
> participated in an extended series of
> administrative proceedings including four IDEA due
> process hearings which resulted in the development
> of an extensive factual record.  Thus one of the
> principal reasons for the exhaustion requirement
> -- to allow the administrative body with the
> relevant expertise to create an evidentiary record
> prior to judicial review -- did not apply in *W.B.*
> Second, all issues in *W.B.* other than the damages
> issue had been resolved by prior administrative
> proceedings.  With only a monetary damages claim
> remaining, the plaintiffs in *W.B.* could gain
> nothing from an IDEA administrative proceeding in
> which damages could not be awarded.  Given the
> presence of a robust administrative record and the
> fact that the plaintiffs could gain nothing from
> recourse to yet another due process hearing, the
> *W.B.* court had little difficulty in dispensing
> with the exhaustion requirement.

*Falzett v. The Pocono Mountain Sch. Dist.*, 150 F. Supp. 2d 699,

704 (M.D. Pa. 2001); *see also Lindsley v. The Girard Sch. Dist.*,

213 F. Supp. 2d 523, 534-37 (W.D. Pa. 2002) (quoting *Falzett* and

agreeing with its reasoning).

Like *Falzett* and *Lindsley*, the two considerations present in

*Matula* are not present in this case.  While Plaintiffs did

participate in administrative proceedings with respect to other

issues, they never challenged the manifestation determination.

Therefore, there has been no administrative review of the

manifestation determination-- a determination that is most

appropriately reviewed in the first instance by experienced

educators.[30]

Moreover, the issue of damages is not the only issue presented in this case.  A claim for damages based on the School District's alleged erroneous manifestation determination necessarily requires the Court to decide whether the behavior which prompted Adam's expulsion was a manifestation of his disability.  In other words, use of the administrative process would help to establish whether or not a violation of federal law has occurred.  Therefore, requiring exhaustion of administrative remedies with regard to any claim based on alleged errors in the manifestation determination is appropriate.  *See Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 284 (3d Cir. 1996)(in a suit seeking monetary damages, affirming dismissal of claim which could have been, but was not, raised in the IDEA administrative proceeding); *see also M.M. v. Tredyffrin / Easttown Sch. Dist.*, No. 06-1966, 2006 U.S. Dist. LEXIS 62918 at *20-23 (E.D. Pa. Sept. 1, 2006) (distinguishing *Matula*, explaining "M's IDEA claim raises substantive issues other than damages, including the adequacy of his 504 Plan . . . and his classification under the IDEA.  Moreover, a court would greatly benefit from the

---

[30] In making the manifestation determination, the CST and "other qualified personnel" must consider "evaluation and diagnostic results;" "observations of the child;" "the child's IEP and placement;" whether the child's disability "impair[ed] the ability of the child to understand the impact and consequences of the behavior subject to disciplinary action;" and whether the child's disability "impair[ed] the ability of the child to control the behavior subject to disciplinary action."  34 C.F.R. § 300.523(c)(1)-(2).

educational expertise that the state administrative process will bring to this case.").

Plaintiffs' failure to exhaust their administrative remedies with respect to the manifestation determination does not, however, end the Court's analysis because Plaintiffs have viable claims which do not require the Court to revisit the determination.  The IDEA provides that even if a student's behavior is not a manifestation of his disability, he is still entitled to FAPE at least until age 18.  20 U.S.C. § 1412(a)(1)(A).[31]  Thus, even if the Court accepts the manifestation determination as true (i.e. Adam's behavior was not a manifestation of his ADD), under the IDEA, Adam was nevertheless entitled to FAPE at least until his 18th birthday.[32] The record indicates, however, that Adam was expelled effective

_____

[31]  The IDEA establishes that all children with disabilities between the ages of 3 and 21 inclusive are entitled to FAPE; however the statute then limits that right, stating that the obligation to provide FAPE to children aged 18 through 21 does not apply "to the extent that its application to those children would be inconsistent with State law or practice."  20 U.S.C. § 1412(a)(1)(A), (B).  Pursuant to New Jersey statute, "persons over five and under 20 years of age" are entitled to free public education.  N.J.S.A. § 18A:38-1; *see also In re Application of Bd. of Education*, 86 N.J. 265, 272 (1981)("The people of New Jersey have enshrined the right to public education in the State Constitution, which provides: 'The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.'") (quoting N.J. Const., Art. VIII, s IV, par. 1); *contrast* N.J.S.A. § 18A:38-25 (compulsory education required of children "between the ages of six and 16 years").

[32]  In addition to granting children a right to free public education until age 20, N.J.S.A. § 18A:38-1, New Jersey law also provides, "[t]he public schools shall be free also to such persons, over the age of 20 years, who, except for age, would be entitled to free education in the district, as the board of education shall determine."  N.J.S.A. § 18A:38-4. Whether this provision entitles Adam to FAPE after age 20 is a question that the Court need not answer at this time.

on his 16th birthday.  To the extent Plaintiffs assert that Adam
was denied FAPE even though his behavior was not a manifestation
of his disability, the Court holds for purposes of this motion
only, that the federal claims in Counts II and IV of the
Complaint are not barred;[33] therefore summary judgment will be
denied.  Likewise, to the extent Counts II and IV assert
supplemental state law causes of action for alleged violations of
Adam's statutory and constitutional rights to free public
education under New Jersey law, summary judgment will be denied.

C.

Finally, Plaintiffs' loss of consortium claim fails as a
matter of law.  The Third Circuit has "not settled whether
damages are recoverable in an action arising solely under IDEA,"
*Bucks County Dep't of Mental Health / Mental Retardation v.*
*Pennsylvania*, 379 F.3d 61, 68 n.5 (3d Cir. 2004) (citations
omitted), however the Court has held that "in a § 1983 action to

---

[33]  Unlike the manifestation determination, Plaintiffs did, to some
extent, pursue administrative remedies with respect to the Board's decision to
expel Adam.  However, the administrative record is somewhat murky as to the
issues raised and decided at the state administrative level, as well as
whether the administrative case was treated as a special education matter or a
general education matter.  At oral argument, counsel for the Board of
Education asserted that this Court lacked jurisdiction to address the merits
of Plaintiffs' Section 504 / IDEA claims because even if Plaintiffs raised the
issues at the state administrative level, they abandoned their administrative
appeal before the State Board of Education, thereby failing to exhaust their
administrative remedies.  *See supra* n.12.  Because this jurisdictional argument
was not squarely briefed by either party, the Court declines to rule on it at
this time.  The Court notes, however, that the dismissal of the other federal
claims raises the question whether this Court should retain jurisdiction to
decide the supplemental state law claims if the jurisdictional argument with
respect to the Section 504 / IDEA claims is resolved against Plaintiffs.

enforce IDEA, . . . compensatory damages are available to remedy IDEA violations." *W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir. 1995) (citation omitted).  Following this logic, the Court will treat the loss of consortium claim as derivative of the § 1983 claims, as opposed to derivative of the IDEA itself.  Because loss of consortium claims are not cognizable in § 1983 suits, *Hurley v. Atlantic City Police Dep't*, No. 93-260, 1995 U.S. Dist. LEXIS 20608 at *46 (D.N.J. Aug. 4, 1995); *Verde v. City of Philadelphia*, 862 F. Supp. 1329, 1337 n.5 (E.D. Pa. 1994), summary judgment on Count V will be granted insofar as the claim derives from the § 1983 claims.

However, to the extent the Complaint asserts violations of New Jersey state law in connection with Adam's expulsion before age eighteen, summary judgment will be denied.  *See Carter v. University of Medicine & Dentistry,* 838 F. Supp. 957, 967 (D.N.J. 1993) (under New Jersey Law, parent's loss of child's consortium is cognizable in suits for intentional torts and negligence actions); *see generally Tynan v. Curzi*, 332 N.J. Super. 267, 270 (App. Div. 2000) ("A father's right to recover for loss of services or earning capacity as a result of tortious injury to a child is firmly rooted in common law.").

## IV.

For the foregoing reasons, Defendant's Motion for Summary

33

Judgment will be granted in part and denied in part.  Summary judgment will be granted on Counts I (drug testing in violation of Fourth Amendment) and III (Due Process violation).  Summary judgment will also be granted on the IDEA and Rehabilitation Act claims (Counts II and IV) but only to the extent they require the Court to review the manifestation determination for which administrative remedies were not exhausted.  To the extent Counts II and IV allege a violation of IDEA, the Rehabilitation Act, and New Jersey law based on Defendant's failure to provide a free and appropriate education to Adam at least until his 18th birthday, summary judgment will be denied.  With respect to the loss of consortium claim (Count V), summary judgment will be granted except to the extent the claim is based on alleged violations of New Jersey law.  The Court will issue an appropriate order.

Date: December 21, 2006

           s/ Joseph E. Irenas
          JOSEPH E. IRENAS, S.U.S.D.J.